IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT
CASE NO.:  24-1813
_____

UNITED STATES OF AMERICA,

          Plaintiff-Appellee,

v.

MICHAEL EISENGA

          Defendant-Appellant.
_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN, CASE NO. 2020-CR-137,
THE HONORABLE JUDGE WILLIAM M. CONLEY, PRESIDING
_____

**BRIEF WITH COMBINED APPENDIX**
**OF DEFENDANT-APPELLANT, MICHAEL EISENGA**
_____

CRAMER MULTHAUF LLP.
Matthew M. Fernholz
WI State Bar No. 1065765
Domonic A. Burke
WI State Bar No. 1104690
*Attorneys for Defendant-Appellant,*
*Michael Eisenga*

P.O. Address:
1601 E. Racine Ave., Ste. 200
P.O. Box 558
Waukesha, WI 53187
262-542-4278
mmf@cmlawgroup.com
dab@cmlawgroup.com

CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No.:  24-1813

Short Caption:  United States v. Michael Eisenga

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R.  App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.

[ ]     PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):  Michael Eisenga

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court: Cramer Multhauf LLP

(3)  If the party or amicus is a corporation:

   i)  Identify all its parent corporations, if any; None

   ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:  None

Attorney's Signature: /s/ Matthew M. Fernholz        Date: June 21, 2024

Attorney's Printed Name:  Matthew M. Fernholz

Please indicate if you are Counsel of Record for the above listed parties pursuant to Circuit Rule 3(d).   Yes  X   No ____

Address: 1601 E. Racine Ave., Suite 200, P.O. Box 558, Waukesha, WI 53187

Phone Number:  (262) 542-4278          Fax Number:  (262) 542-4270

E-Mail Address:  mmf@cmlawgroup.com

# TABLE OF CONTENTS

Page No.

JURISDICTIONAL STATEMENT ..................................................................5

STATEMENT OF THE ISSUES .....................................................................6

STATEMENT OF THE CASE .........................................................................6

I.      NATURE OF THE CASE AND PROCEDURAL BACKGROUND
        .................................................................................................................6

II.     RELEVANT BACKGROUND FACTS ...........................................11

        A.      Eisenga's Entities and Income ................................................11

        B.      Dealings with the City of Columbus and Alliant Credit
                Union ..........................................................................................13

SUMMARY OF THE ARGUMENT ...........................................................16

STANDARD OF REVIEW ..........................................................................17

ARGUMENT...................................................................................................17

I.      THE DISTRICT COURT ERRED IN CONCLUDING THAT THE
        GOVERNMENT MET ITS BURDEN FOR VEIL PIERCING ......18

        A.      The Government Failed to Demonstrate that the First
                Element of the *Olsen* Test Was Satisfied and the District
                Court Erred in Concluding that it Did..................................23

                1.      Eisenga Does Not Treat Corporate Assets as His Own ......25

                2.      Eisenga Does Not Withdraw Funds from the Corporation at
                        Will.................................................................................................25

                3.      Eisenga Does Not Hold Himself Out as Being Personally
                        Liable for the Debts of the Corporation ................................26

                4.      LLCs Do Not Issue Stock.........................................................26

                5.      Eisenga Does Not Co-Mingle His Personal Assets with
                        Those of the LLCs ....................................................................26

1

      **6.**     **Eisenga Manages the LLCs as Independent Entities, Taking Into Account Their Corporate Formalities.**............................27

   **B.**     **The District Court Erred in Concluding that the Government Satisfied the Second and Third Elements of the *Olsen* Test, Because of the Temporal Order of the Payment Structure**........................................................29

      **1.**     **The Second Element: Intent**......................................................30

      **2.**     **The Third Element: Cause**........................................................31

**II.**     **THE DISTRICT COURT ERRED BY FAILING TO ABSTAIN IN LIGHT OF ONGOING STATE COURT ACTION, UNDER *YOUNGER***...........................................................................32

**CONCLUSION**........................................................................................34

**CERTIFICATION OF COMPLIANCE WITH TYPE-VOLUME LIMIT**..36

**TABLE OF CONTENTS - SHORT-FORM APPENDIX** ...........................37

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Berrada Properties Mgmt. Inc. v. Romanski,*
    608 F. Supp. 3d 746 (E.D. Wis. 2022) ....................................................32

*Consumer's Co-op of Walworth County v. Olsen,,*
    142 Wis. 2d 465, 419 N.W.2d 211 (1988) ..............................19-25, 29-31

*J.B. v. Woodard,*
    997 F. 3d 714 (7th Cir. 2021) ..................................................................32

*Laborers' Pension Fund v. Lay-Com, Inc.,*
    580 F.3d 602 (7th Cir. 2009) ..................................................................18

*Michels Corp. v. Haub,*
    2012 WL 3764429 ..............................................................................21, 24

*Middlesex Cnty. Ethics Comm. v. Garden State Bar Assoc.,*
    457 U.S. 423 (1982) ........................................................................... 32-33

*Milwaukee Toy Co. v. Industrial Comm'n of Wis.,*
    203 Wis. 493, 234 N.W. 748 (1931) ..................................................18, 21

*Mulholland v. Marion Cnty. Election Bd.,*
    746 F.3d 811 (7th Cir. 2014) ..................................................................33

*Olen v. Phelps,*
    200 Wis. 2d 155, 546 N.W.2d 176 (Ct. App. 1996) ........................22, 30

*Rasmussen v. Gen. Motors Corp.,*
    2011 WI 52, 335 Wis. 2d 1, 39 n.20, 803 N.W.2d 623 ..........................21

*Sprint Commc'ns, Inc. v. Jacobs,*
    571 U.S. 69 (2013) ..................................................................................33

*United States v. Sloan*
    505 F.3d 685 (7th Cir. 2007) ..................................................................17

*United States v. Taylor,*
    688 F. Supp. 1163 (E.D. Tex. 1987) .......................................................22

*Wiebke v. Richardson & Sons, Inc.,*
    83 Wis. 2d 359, 265 N.W.2d 571 (1978)................................................19

*Younger v. Harris,*
    401 U.S. 37 (1971).........................................................8-10, 17-18, 32-34

**Statutes**

Wis. Stat. Ch. 183....................................................................................26

Wis. Stat. § 183.0115................................................................................28

Wis. Stat. § 183.0201................................................................................28

Wis. Stat. § 183.0212................................................................................28

Wis. Stat. § 183.0405...........................................................................21, 24

Wis. Stat. Rule 809.23..............................................................................21

**Other Authorities**

18 U.S.C. § 981.........................................................................................5

18 U.S.C. § 982.........................................................................................5

18 U.S.C. § 1344....................................................................................5, 8

18 U.S.C. § 3664.......................................................................................5

28 U.S.C. § 2461.......................................................................................5

Fed. R. Evid. 201.....................................................................................17

# JURISDICTIONAL STATEMENT

## I.   DISTRICT COURT JURISDICTION

The District Court had jurisdiction over this matter by virtue of the United States' prosecution of Eisenga for an alleged violation of 18 U.S.C. § 1344(2).  It also sought a forfeiture under 18 U.S.C. §§ 981(a)(1)(C), 982 and 28 U.S.C. § 2461(c).  The Government subsequently sought a garnishment disposition on an order of restitution, pursuant to 18 U.S.C. § 3664.

## II.   APPELLATE COURT JURISDICTION

The Court of Appeals for the Seventh Circuit has jurisdiction over this appeal pursuant to 28 U.S.C. §§ 1291 and 1294 as the orders appealed from were final orders from the District Court for the Western District of Wisconsin.

### Other Information Required by Cir. R. 28(a)(2):

| | |
|---|---|
| **i) The date of entry of the judgment or decree sought to be reviewed:** | April 30, 2024 |
| **(ii) The filing date of any motion for a new trial or alteration of the judgment or any other motion claimed to toll the time within which to appeal:** | N/A |
| **(iii) The disposition of such a motion and the date of its entry:** | N/A |
| **(iv) The filing date of the notice of appeal (together with information about an extension of time if one was granted):** | May 10, 2024 |

**(v) If the case is a direct appeal from the decision of a magistrate judge, the dates on which each party consented in writing to the entry of final judgment by the magistrate judge:** <u>N/A</u>

## STATEMENT OF THE ISSUES

I.     Did the District Court err by reverse piercing the corporate veil of Columbus Commerce Center, LLC to satisfy the debts of Michael Eisenga, when Columbus Commerce Center is a properly maintained LLC not connected to Eisenga's crimes?

II.     Did the District Court err in rejecting the applicability of the *Younger* Abstention Doctrine to this case, in light of related and ongoing litigation at the state level?

## STATEMENT OF THE CASE

### I.   NATURE OF THE CASE AND PROCEDURAL BACKGROUND

On October 22, 2020, the United States filed an indictment against Michael Eisenga, alleging that he, through the entity CCC Lot 2, LLC engaged in a scheme to defraud Alliant Credit Union for the purpose of securing loan funds to develop a grocery store building on property owned by CCC Lot 2. (R. 2 (App. 21-23).) Particularly, the Government alleged that Eisenga, in CCC Lot 2's loan application, had falsely represented that he had secured a tenant, Festival Foods, Inc., to operate the store, and that Supervalue Holdings, Inc., had guaranteed a 20-year lease for Festival Foods. (*Id.*)

6

Specifically, the Government alleged that this was in violation of 18 U.S.C. § 1344(2) and § 2. (*Id.*)  In the indictment, the Government also sought a forfeiture against Eisenga. (*Id.* (App. 23).)

On February 16, 2021, Eisenga entered a plea agreement, entering a plea of guilty to the single count in exchange for a reduced sentencing recommendation. (*See* R. 17.)  As part of the agreement, Eisenga agreed to pay restitution. (*Id.* at 3-4.)  On June 29, 2021, the Court entered judgment, found Eisenga guilty, sentenced him, and imposed a restitution order in the amount of $4,027,025.51. (R. 40 (App. 27-32).)  On that day, the Court also entered an order of forfeiture, entering money judgment against Eisenga for that amount. (R. 38 (App. 25-26).)

On July 26, 2022, the Government brought an application for writ of continuing garnishment, alleging that the City of Columbus held funds due to Eisenga and that Eisenga still owed $3,859,809.48 of the restitution order. (R. 60.)  On July 28, 2022, the Court entered an order granting the application for writ of continuing garnishment and issued the writ. (R. 61, R. 62.)  On August 26, 2022, the City of Columbus answered the garnishment, denying that it held any property in which Eisenga maintained an interest, but affirmatively volunteering that it held property for an entity in which it knew Eisenga was

a member, Columbus Commerce Center, in a total amount of $110,970.48. (R. 64 at 4.)

On April 13, 2023, the Government brought a motion for garnishment disposition order, in which it sought an order directing the City of Columbus to turn over the funds that it held in the name of Columbus Commerce Center. (R. 65.) On May 23, 2023, Eisenga filed a brief in opposition to that motion, arguing that (1) the efforts to garnish the City for assets of Columbus Commerce Center were barred by issue preclusion and claim preclusion, (2) that the Federal Court should not interfere under the *Younger* abstention doctrine in an issue that was ongoing in the state court, and (3) because Columbus Commerce Center was a separate entity than Eisenga and CCC Lot 2, there was no basis to garnish funds owed to it. (R. 72.) The Government filed a reply brief on June 16, 2023. (R. 76.) On August 7, 2023, the Court heard oral argument on the motion. (*See* R. 77; R. 78 (App. 12-13); R. 101.) The Court summarily concluded, without explanation, that it was not going to abstain under *Younger*. (R. 101 at 18:25-19:2: "…it's a stretch under *Younger*, and I'm not going to abstain." (App. 17-18).) The Court also indicated in that hearing that neither issue nor claim preclusion prevented the Government from proceeding against Columbus Commerce Center, as the Government had not been a party to the state court proceedings. (*Id.* at 9

(App. 15).)   The Court indicated further information was needed for it to decide the question of piercing the corporate veil, and permitted the parties to conduct discovery and participate in an evidentiary hearing on those issues before the Court.  (*Id.* at 19-21 (App. 18-20).)   The Court entered a text only order to this effect on August 7, 2023.   (R. 78 (App. 12-13).)   The District Court entered a text only order memorializing these holdings and, with respect to the *Younger* Doctrine, noting that "the United States may always litigate in its own courts."  (R. 78 (App. 12).)   On August 31, 2023, the Court held an evidentiary hearing in which Eisenga testified regarding his business dealings.  (*See* R. 81; R. 82; R. 102.)   Following that hearing, the Court gave the parties 60 days to conduct discovery and file supplementary briefing on the issue of piercing the corporate veil.   (R. 102 at 45-46.)   The Government engaged in discovery, requesting documents and taking the deposition of Eisenga.   (*See, e.g.,* R. 85; R. 94.)

On October 31, 2023, the Government filed a supplemental brief seeking a garnishment order for the provision of held funds from the City.   (R. 84.)   On November 21, 2023, Eisenga filed a supplemental response in opposition to the garnishment disposition order (R. 90), which included a declaration from his accountant, Sam Miller, opining on the accounting practices of Columbus Commerce Center.  (R. 93 (App. 33-35).)   Miller

opined that the accounting practices of which the Government complains were acceptable accounting practices. (*Id.*, ¶¶ 5, 7, 9, 11 (App. 34-35).) For example, transferring funds directly from the First American Property account to Eisenga's personal checking account is an acceptable form of a draw. (*Id.*, ¶¶ 4-5 (App. 33-34).) There is also nothing inappropriate in First American Properties loaning funds to Eisenga, so long as those loans are appropriately designated. (*Id.*, ¶¶ 6-7 (App. 34).)

On April 30, 2024, the District Court issued a written opinion and order in which it granted the Government's motion for garnishment disposition order, holding that the Government had met is burden to demonstrate that a reverse piercing of the corporate veil was appropriate. (R. 96 (App. 3-11).) It reasoned that Eisenga's relationship with First American Properties and its subsidiaries, particularly his degree of control and the informal transferring of funds, satisfied the first element of the veil piercing test. (*See id.* at 5-8 (App. 7-10).) It concluded that the second and third elements of the veil piercing test were met because Columbus Commerce Center obtained the TIF funds *after* committing a fraud. (*Id.* at 8-9 (App. 10-11).) With respect to issue and claim preclusion and the *Younger* abstention doctrine, the Court noted only that it had previously rejected those arguments. (*Id.* at 4 (App. 6).) The Court

issued the garnishment disposition order on that day.  (R. 97 (App. 1-2).)
Eisenga subsequently initiated this appeal.  (R. 98.)

## II.   RELEVANT BACKGROUND FACTS

### A.   Eisenga's Entities and Income

Eisenga is an entrepreneur, primarily earning his living through a variety of LLCs engaging in real estate investing and development.  (R. 94[1] at 6-7.)  Among Eisenga's assets is First American Properties, LLC, a limited liability company of which his trust, the Michael S. Eisenga Living Trust, is the sole member. (*Id.* at 16.)  First American Properties is the holding entity and sole member of other LLCs associated with Eisenga, including Columbus Commerce Center, LLC, Wildwood Estate, LLC (*id.* at 71-72), Mayville Holdings, LLC (*id.* at 171), Advantage Management Mayville, LLC (*id.* at 153), and CMB Ventures, LLC (*id.* at 165-66).  All of these entities are registered with the Wisconsin Department of Financial Institutions.  (*See* R. 92-1 – R. 92-8.)

First American Properties was organized in 2005 with Eisenga then as its sole member.  (R. 92-1 at 3.)  First American Properties is the holding company which operates and is the sole member of all of these entities.  (R. 94 at 115-116.) Wildwood owns and rents out a lakefront vacation home on

---

[1] R. 94 is a deposition transcript.  Page numbers refer to the native pages of the transcript.

Oconomowoc Lake. (*Id.* at 72.) Mayville Holdings and Advantage Management Mayville own and operate, respectively, a nursing home in the City of Mayville. (*Id.* at 153, 171, 182.) CMB Ventures owns and leases out commercial and industrial property in the City of Columbus. (*Id.* at 166.)

Eisenga is responsible for the management of First American Properties and its subsidiaries. (*See, e.g., id.* at 5-7.) First American Properties' bookkeeper, Vicki Schultz, and its operations manager, Mark Forster, assist Eisenga in the operations of the companies. (*See id.* at 15.) As part of their duties, when First American Properties receives a bill, each of the three independently reviews and must approve the bill as a business expense before First American Properties issues payment, even though neither Forster or Schultz have any ownership interest. (*Id.*)

First American Properties and each of its subsidiaries have their own bank accounts. (*See id.* at 10, 180 (regarding CMB Ventures), 18, 180-81 (regarding First American Properties), 32, 179-80 (regarding Advantage Management Mayville), 180-81 (regarding Mayville Holdings), 165, 180-81 (regarding Wildwood).) Each of the entities pays its own expenses and receives its own income. (*See id.*; *see also id.* at 83, 134-35, 151.) For example, the Wildwood account is funded with revenue from rentals and used to pay the mortgages on the Wildwood property. (*Id.* at 72-74.) Profits from

each of the subsidiaries' bank accounts are passed from each subsidiaries' respective account to First American Properties. (*See, e.g., id.* at 66-67, 93-95.) Relatedly, when one of the subsidiaries has an expense for which it lacks funds, First American Properties, as the sole member, transfers/invests money into the subsidiary to meet the expense. (*See, e.g., id.* at 201.)

Eisenga does not take a salary from any of the entities. (*Id.* at 7.) Rather, when he has personal expenses, Schultz moves funds from First American Properties' checking account to Eisenga's personal checking account so that he can pay his bills. (*Id.* at 7-8, 41-43.) However, because First American Properties has not been profitable of late, Eisenga has not been taking actual transfers out of First American Properties. (*Id.* at 39, 67.) Occasionally, Eisenga authorize loans to himself from First American Properties, which are effectuated by transferring funds from the First American Properties account to his own checking account. (*Id.* at 39, 44-46, 67.) These transfers are denoted as "loans." (*Id.* at 44-46.) If a loan occurs, Eisenga is to pay the loan back to First American Properties. (*Id.*)

### B. Dealings with the City of Columbus and Alliant Credit Union.

In 2008, the City of Columbus entered into a development agreement with First American Properties and later with Columbus Commerce Center for development of real estate which included a Tax Incremental Finance

("TIF") District. (R. 32-1 at 1.) After multiple amendments to the development agreement that created the TIF, two separate lots were developed. (R. 73-5 at 4.) One of those lots was the 150 Commerce Drive property, on which a building for a grocery store was constructed. (*Id.*) In 2014, CCC Lot 2 acquired title to the 150 Commerce Drive property. (*Id.*) Significantly, CCC Lot 2 was never made a party to the TIF agreement. (*Id.*)

As development continued, it was the property at 150 Commerce Drive, owned by CCC Lot 2, for which the mortgage—giving rise to the indictment in this case—was acquired through Alliant Credit Union. (*See* R. 73-10.) In 2019, Alliant initiated suit against CCC Lot 2 and Eisenga. (*See id.*) In that suit, it sought foreclosure of the mortgage and the appointment of a receiver. (*See* R. 73-1; R. 73-2.) Alliant obtained that relief. (*See* R. 73-1; R. 73-2.)

In July 2019 and February 2020, the City of Columbus received invoices from Columbus Commerce Center for requests for payment under the TIF. (R. 73-4, ¶ 9.) Although the City was aware that the 150 Commerce Drive property was in receivership and a foreclosure was pending, the City honored the terms of the TIF and issued two payments to Columbus Commerce Center for the 150 Commerce Drive property. (*Id.*, ¶ 10.)

As a result of these payments, Alliant filed a civil lawsuit against Eisenga, Columbus Commerce Center, and the City of Columbus on April 28,

2021. (R. 73-4.) Alliant alleged that the City should not have made payments to Columbus Commerce Center while the property was in receivership. (*Id.*, ¶10.) It alleged causes of action for conversion, civil conspiracy, and unjust enrichment against Eisenga and Columbus Commerce Center. (*Id.*, ¶¶11-16.)

In that case, the City of Columbus brought a motion for summary judgment on Alliant's negligence claim against it. (*See* R. 73-7.) It argued that the City entered into a development agreement with Columbus Commerce Center to facilitate development of certain lands and to require Columbus Commerce Center to install necessary public infrastructure. (R. 73-7 at 2-4.) In exchange, the City agreed to provide Columbus Commerce Center with development incentives based on the assessed value of the completed development. (*Id.*) At no point, the City argued did it have any obligations to CCC Lot 2 or Alliant Credit Union. (*Id.*) The Circuit Court for Columbia County held a hearing on the City's motion for summary judgment on December 13, 2022. (*See* R. 73-9.) At the hearing, counsel for the City reiterated:

> [T]his was property taxes that the property [at 150 Commerce Drive] was obligated to pay to the city and the city had the right to use for any purpose it wanted consistent with the tax incremental financing law. And that's exactly what the city did when it entered into a separate agreement with the developer. And that agreement was in no way implicated by the appointment of the receiver.

(*Id.* at 3:15-22.)  The court granted the City's motion, and dismissed the City from the lawsuit.  (R. 73-8.)

Subsequently, the Columbia County Circuit Court entered default judgment against Eisenga and Columbus Commerce Center.[2]  Columbus Commerce Center filed a motion to vacate the default judgment entered against it on December 4, 2023, which was denied by order of February 14, 2024.[3]  Columbus Commerce Center appealed that order and this appeal is ongoing before the Wisconsin Court of Appeals.[4]

## SUMMARY OF THE ARGUMENT

I.     The District Court erred in concluding that the Government had met its burden to reverse pierce the corporate veil of Columbus Commerce Center.  This is because the Court's overly strict reading of corporate formalities indicated that Eisenga exercised excessive control over Columbus Commerce Center.  The District Court also erred in concluding that because

---

[2] *See* Court Minutes from Columbia County (Wisconsin) Circuit Court Case No. 2021CV000109, *available                                                                                      at* https://wcca.wicourts.gov/caseDetail.html?caseNo=2021CV000109&countyNo=11&index=0. Pursuant to Fed. R. Evid. 201, a court may take judicial notice of publicly available court records such as Wisconsin's Consolidated Court Automation Programs (CCAP).  *In re Hubbartt*, No. 16-21251-BEH, 2020 WL 1845041, at *1 n.2 (Bankr. E.D. Wis. Apr. 10, 2020); *see also In the Matter of Lisse*, 905 F.3d 495, 496 (7th Cir. 2018).

[3] *See id.*

[4] *See id.; see also* Court Record for Wisconsin Court of Appeals Case No. 2024AP000457, *available                                                                                      at* https://wscca.wicourts.gov/caseDetails.do?caseNo=2024AP000457&cacheId=2288E3C10889C5 F78B6C171E9A9548CE&recordCount=12&offset=2.

the payment of funds to Columbus Commerce Center occurred after the fraud, the second and third elements necessary to pierce the corporate veil were satisfied. But the District Court ignored the temporal nature of the cause and intent elements. Because of these errors, the District Court failed to realize that the Government had not met is burden on the veil piercing claim.

II.    The District Court erred in concluding that it was not barred under the *Younger* abstention doctrine from issuing an order for disposition of garnishment, despite the existence of other judgments and ongoing litigation in state court cases regarding those same funds and parties. Under *Younger*, a court should abstain when there is a risk that its actions interfere with a state court's ability to enforce its judgments. The District Court should have acknowledged such a risk here.

## STANDARD OF REVIEW

The Court of Appeals reviews a district court's authority to enter garnishment orders in proceedings collateral to an underlying criminal action *de novo*. *United States v. Sloan*, 505 F.3d 685, 694 (7th Cir. 2007). Factual findings in support of such orders are reviewed for clear error. *Id.*

## ARGUMENT

The District Court engaged in two errors of law when deciding to grant the Government's motion for a Garnishment Disposition Order, permitting the

Government to access funds held by an entity distinct from Eisenga, Columbus Commerce Center.  First, the District Court erred as a matter of law in concluding that the Government had met its burden of proof with respect to piercing the corporate veil of Columbus Commerce Center.  Second, the District Court also erred when, in light of factually related and ongoing state court litigation, it failed to abstain from ruling on the Government's motion under the principles of the *Younger* abstention doctrine.  These issues are discussed in turn.

## I. THE DISTRICT COURT ERRED IN CONCLUDING THAT THE GOVERNMENT MET ITS BURDEN FOR VEIL PIERCING.

Because veil piercing is an equitable remedy governed by state law, the federal courts apply state law when looking at a veil piercing claim.  *See, e.g., Laborers' Pension Fund v. Lay-Com, Inc.*, 580 F.3d 602, 610 (7th Cir. 2009).  Under Wisconsin law, as elsewhere, it is well established that a corporation is an entity separate and distinct from its shareholders, even when it is owned by one person.  *See, e.g., Milwaukee Toy Co. v. Industrial Comm'n of Wis.*, 203 Wis. 493, 495, 234 N.W. 748 (1931).  In light of this overarching doctrine, a corporation's corporate veil should only be pierced if it can be shown that a corporate entity has no separate existence than its individual shareholder.  *Id.* at 495-96.  A corporate veil should only be pierced when "applying the corporate fiction would accomplish some fraudulent purpose, operate as a

18

constructive fraud, or defeat some equitable claim." *Id.* A corporate veil can only be pierced when the corporate entity acts as the "alter ego" of the individual. *See id.* The burden is on the proponent of veil piercing to show that "corporate affairs are organized, controlled and conducted so that the corporation has no separate existence of its own and is the mere instrumentality of the shareholder and the corporate form is used to evade an obligation, to gain an unjust advantage or to commit an injustice." *Wiebke v. Richardson & Sons, Inc.*, 83 Wis. 2d 359, 363, 265 N.W.2d 571 (1978).

The Wisconsin Supreme Court has established three elements to determine when piercing a corporation's veil is appropriate. *See Consumer's Co-op of Walworth County v. Olsen*, 142 Wis. 2d 465, 484, 419 N.W.2d 211 (1988). These elements are:

> (1) Control, not mere majority or complete stock control, but complete domination, not only of finances but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and
>
> (2) Such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or dishonest and unjust act in contravention of plaintiff's legal rights; and
>
> (3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of…

*Id.* (internal citations omitted). All three elements must be satisfied in order to pierce a corporate veil. *Id.* at 482-484. Domination, absent the injustice of

the second element and the causation of the third element, does not warrant veil piercing.  *Id.*

When evaluating the first element, courts look at whether there has been personal domination and control by an individual and if an entity fails to follow corporate formalities.  *Id.* at 485.  The Wisconsin Supreme Court in *Olsen* also established a list of factors to consider to see if an entity truly fails to observe corporate formalities:

> [F]ailure to hold corporate board meetings; failure to maintain records; inadequate capitalization at the inception of the corporation; and intermingling of personal and corporate funds….More generally, factors relevant to the first prong of the instrumentality analysis of whether "shareholders have confused the corporation's identity with their own" may include: "1) The shareholder's treating the corporate assets as his own; 2) Withdrawal of capital from the corporation at will; 3) The shareholder's holding himself out as being personally liable for the debts of the corporation; 4) Failure to issue stock; 5) Co-mingling of assets; and 6) Managing the corporation without regard to its independent existence."

*Olsen*, 142 Wis. 2d at 490 n.10 (internal citations omitted).  It must be noted, however, that in closely held businesses, such as LLCs, which have corporate requirements that are less strict, a mere failure to thoroughly maintain corporate records and books does not constitute grounds to pierce a corporate veil.  *Id.* at 490 ("a failure of shareholders in a closely held corporation to strictly observe corporate formalities is not relevant to our decision of whether to pierce the corporate veil of a close corporation absent evidence indicative of and amounting to a true disregard of the corporate entity"); *see also* Wis.

Stat. § 183.0405(4); *see also Michels Corp. v. Haub*, 2012 WL 3764429, ¶¶ 17-20 (unpublished) (Lundsten, P.J.)[5] (applying the *Olsen* factors to a Wis. Stat. Ch. 183 created LLC).

The second and third elements of the *Olsen* test to determine whether it is appropriate to pierce the corporate veil are intertwined. *See Olsen*, 142 Wis. 2d at 481-86. In applying these elements, a court is to ask, with respect to the second element, whether the domination of the corporate entity was undertaken for the purpose of wrongdoing or to result in an injustice, and, with respect to the third element, whether that injustice caused the harm complained of. *Id.* In other words, the actual injustice allegedly resulting from the control must be causal to the harm asserted. *See id.*

When analyzing whether it is appropriate to pierce a corporate veil, courts must acknowledge the significant importance of preserving the corporate entity. *See, e.g., Milw. Toy Co.*, 203 Wis. at 49. Because of this, the corporate veil should be pierced only rarely, in the most egregious of situations. *See, e.g., Rasmussen v. Gen. Motors Corp.,* 2011 WI 52, 335 Wis. 2d 1, 39 n.20, 803 N.W.2d 623 (Abrahamson, C.J., concurring). When performing the analysis a court must always keep in mind that the burden of

---

[5] Because this opinion is authored, it is citable as persuasive authority under Wisconsin law pursuant to Wis. Stat. Rule 809.23(3)(b).

demonstrating facts sufficient to pierce the corporate veil is on the proponent of the piercing. *Olsen*, 142 Wis. 2d at 481-86.

This case does present an unusual, but far from unprecedented application of the veil piercing doctrine. Ordinarily, a party seeks to pierce the corporate veil when it is attempting to access a shareholder's personal assets to satisfy a corporate debt. *Olen v. Phelps*, 200 Wis. 2d 155, 163, 546 N.W.2d 176 (Ct. App. 1996). However, as in this case, the doctrine may also be applied in reverse to pierce the corporate veil of an entity to satisfy the personal debt of a shareholder. *Id.* The "reverse" veil piercing process still requires a court to apply the alter ego doctrine discussed above. *Id.* at 162-63. In the case of reverse veil piercing, the injustice committed by the exercise of undue control is usually an attempt to preserve the individual's assets from exposure to collection or other liability. *Id.* at 163-64. This often takes the form of a fraudulent transfer. *Id.* (citing *United States v. Taylor*, 688 F. Supp. 1163, 1164-65 (E.D. Tex. 1987)).

In light of this body of law, it becomes clear that the District Court erred in concluding that Government had met is burden with respect to the alter ego test so as to pierce the corporate veil of Columbus Commerce Center, via garnishment, to satisfy the personal debts of Eisenga. The District Court erred

in concluding that the Government had demonstrated sufficient facts to warrant veil piercing.

The Government failed to meet its burden on all three elements of the *Olsen* test. Contrary to existing law, when deciding to pierce the corporate veil of Columbus Commerce Center, the Court relied too strongly on a strict application of corporate formalities in applying the first element and ignored the lack of supporting facts when analyzing all three elements.

**A. The Government Failed to Demonstrate that the First Element of the *Olsen* Test Was Satisfied and the District Court Erred in Concluding that it Did.**

When concluding that this element of the *Olsen* test was satisfied, the District Court concluded that the manner in which Eisenga was compensated by First American Properties and his lack of adherence to corporate formalities justified piercing the corporate veil of Columbus Commerce Center. However, in so doing, the Court applied corporate formalities too strictly, thereby overlooking the lack of evidence presented by the Government.

In analyzing this first element, in essence, a court tries to determine whether the individual "tru[ly] disregard[s]" the corporate entity. *Olsen*, 142 Wis. 2d at 490. In so analyzing this question, by way of factors, a court should look to whether the shareholder or owner:

1) Treats the corporate assets as his own;

2) Withdraws capital from the corporation at will;

3) Holds himself out as being personally liable for the debts of the corporation;

4) Fails to issue stock;

5) Co-mingles assets; and

6) Manages the corporation without regard to its independent existence.

*Id.* at 490 n.10.

To determine whether this element is satisfied, a court may look to an entity's adherence to corporate formalities, though courts are discouraged—particularly in cases involving closely held entities and LLCs—from holding owners to an overly strict interpretation of corporate formalities. *Olsen*, 142 Wis. 2d at 490; *see also* Wis. Stat. § 183.0405(4); *see also Michels Corp. v. Haub*, 2012 WL 3764429, ¶¶ 17-20 (unpublished) (Lundsten, P.J.). Yet, in its opinion, the District Court pointed only to formalities in concluding that Eisenga's decision to have the bookkeeper Schultz transfer funds to his personal account, to directly cover personal expenses, and to give loans. (R. 96 at 5-8 (App. 7-10).) However, the evidence demonstrates that these transfers were all properly documented. (R. 93 (App. 33-35).) The reasoning employed by the District Court could result in any single member LLC, which pays a manager for his work, or loans the manager money, being subject to veil piercing.

However, had the District Court not applied the corporate formalities so strictly, it would have seen that the Government did not advance any evidence satisfying any of the factors of the first element, that Eisenga treats Columbus Commerce Center or First American Properties as alter egos. This is because none of the express factors set out in *Olsen* to evaluate the first element support a finding that Eisenga manages Columbus Commerce Center or First American Properties as an alter ego. The City did not meet its burden in that regard.

### 1. Eisenga Does Not Treat Corporate Assets as His Own.

As described, Eisenga maintains a separate bank account and pays his personal expenses with funds from that account. While he has taken loans from First American Properties, these loans have been denoted as such and will be paid back by Eisenga. The Government did not provide any evidence that Eisenga holds out corporate assets as his own.

### 2. Eisenga Does Not Withdraw Funds from the Corporation at Will.

Eisenga testified that, because First American Properties (*i.e.*, the net of its subsidiaries) has not been profitable over the past several years, he has not drawn much if anything by way of funds out of the entity as personal compensation. (R. 94 at 39, 67.) As previously discussed, according to CPA Miller, the accounting practices used by Eisenga, First American Properties,

and Columbus Commerce Center, in terms of drawing profit, taking loans, and transferring funds between parent and subsidiary entities, are perfectly acceptable from an accounting perspective.  (R. 93, ¶¶ 5, 7, 9, 11 (App. 34-35).)  In fact, the accountant testified that, if the corporation is not profitable, it is preferred for a member or manager to take a loan in lieu of a salary or ownership draw.  (*Id.*, ¶¶ 6-7 (App. 34).)

### 3. Eisenga Does Not Hold Himself Out as Being Personally Liable for the Debts of the Corporation.

On the third factor, the Government did not present any evidence demonstrating that Eisenga holds himself out as being personally liable for Columbus Commerce Center or First American Properties.

### 4. LLCs Do Not Issue Stock.

The fourth factor, which considers whether Eisenga has failed to issue stock, is immaterial to limited liability companies for which shares are not issued.  *See* Wis. Stat. Chapter 183.

### 5. Eisenga Does Not Co-Mingle His Personal Assets with Those of the LLCs.

With respect to the fifth factor, the Government did not demonstrate any evidence that Eisenga co-mingles his personal assets with those of Columbus Commerce Center or First American Properties, or that any of the other subsidiaries' assets are co-mingled.  Eisenga has a personal bank account in which he holds his personal assets.  (*See* R. 94 at 7-8, 41-43.)  Each

26

of the LLCs—Columbus Commerce Center, First American Properties, and First American Properties' other subsidiaries—all have separate banking accounts to which their respective revenue is deposited and from which their respective expenses are paid. (*See id.* at 10, 18, 32, 165, 179-181.) When a subsidiary generates excess revenue or profit, it is sometimes transferred to First American Properties and re-invested by First American Properties into another subsidiary, but Eisenga is not personally involved in this process. (*Id.* at 66-67, 93-95, 201.) While Eisenga occasionally takes loans from First American Properties, they are designated as such. (*Id.* at 39, 44-46, 67.) First American Properties' accountant testified that these actions do not constitute co-mingling. Accordingly, the fifth factor does not apply. (R. 93, ¶ 7 (App. 34).)

**6. Eisenga Manages the LLCs as Independent Entities, Taking Into Account Their Corporate Formalities.**

As to the sixth factor, the Government also failed to demonstrate any facts suggesting that Eisenga manages either First American Properties or Columbus Commerce Center without regard to their independent existence. To the contrary, the deposition of Eisenga demonstrated that he takes care to

maintain their separate existence.[6]  First, Eisenga does not merely manage the entities unilaterally by himself.  This is exemplified by the fact that, prior to First American Properties paying any bills or invoices, Eisenga, Schultz, and Forster all must agree that the billed expense is properly a business expense. (R. 94 at 15.)  Eisenga's efforts to keep separate accounts for First American Properties and each of the subsidiaries (as well as himself) also demonstrates his efforts in this regard.  In further support of this factor, it is also clear that Eisenga has maintained the corporate formalities of the LLCs.  Both First American Properties and Columbus Commerce Center have prepared and filed operating agreements with the Wisconsin Department of Financial Institutions.  (*See* R. 92-1 – R. 92-8.)  *See* Wis. Stat. § 183.0201.  They have each designated registered agents and offices with WDFI.  (*See id.*, Exs. B, D.)  *See* Wis. Stat. § 183.0115.  (*See* R. 92-1 – R. 92-8.)    They have each timely filed annual reports every year since their inception.  (*See* R. 92-1 – R. 92-8.)  *See* Wis. Stat. § 183.0212.

Based upon this analysis, the Government did not establish facts in support of a finding satisfying the first element, that Eisenga treated Columbus Commerce Center or First American Properties as his alter ego.

---

[6] Ironically, the Government and District Court, in treating the actions of First American Properties and its other subsidiaries as one and the same as Columbus Commerce Center, seem to ignore that distinction.

But for the District Court's overly strict interpretation of corporate formalities, there was no evidence to support such a finding. Therefore, the District Court erred when it found that the first element of the *Olsen* test was satisfied.

**B.    The District Court Erred in Concluding that the Government Satisfied the Second and Third Elements of the *Olsen* Test, Because of the Temporal Order of the Payment Structure.**

The District Court also erred in concluding that the Government met its burden with respect to the second element of the *Olsen* test. In a single paragraph addressing both the second and third elements, the District Court cursorily concluded that because Columbus Commerce Center distributes TIF payments to First American Properties and Eisenga, and because the TIF payments were made after the alleged fraud, that the second and third elements are met. However, a correct application of law demonstrates that this is not the case. The Government failed to meet its burden, because any elements of control that Eisenga could exercise over Columbus Commerce Center and First American Properties were established long before the alleged fraud.

The *Olen* case, which expressly authorizes a reverse piercing, is informative as to this point. *See* 200 Wis. 2d at 163. That case also involved a garnishment action. *Id.* at 159. The defendant had previously been sued for failing to properly invest money brought to him by a client. *Id.* at 158. The

client obtained a default judgment against the defendant. *Id.* It happened that after judgment was entered, the defendant had become the sole-shareholder of an accounting firm, and he used the firm's bank accounts in lieu of his own. *Id.* at 159. The firm's record keeping was informal or non-existent. *Id.* While there was a judgment against him, the defendant transferred title of the firm's office building to his daughter. *Id.* at 160-62. The trial court concluded that it could reverse the real estate transfer as a fraudulent transfer and reverse pierce the firm's corporate veil, because the defendant had used his influence and control over the firm to transfer the real estate title with the intention of frustrating collections. *Id.* at 163-64. The court of appeals affirmed this holding, impliedly finding that the fraudulent transfer had been an unjust act and that the unjust act *caused* the former client to be unable to recover the asset. *Id.*

*Olen* demonstrates that the District Court erred by concluding that the second and third elements were met simply because the City paid TIF funds to Columbus Commerce Center *after* the fraud occurred.

### 1. The Second Element: Intent

The second element of the *Olsen* test requires a showing that a defendant retained the power and control with the intention to defraud. Unlike in *Olen*, there is no indication in Eisenga's case that his control over First

American Properties or Columbus Commerce Center was intended to unjustly keep assets from Alliant. Therefore, the District Court's conclusion that this element was satisfied because the transfer of funds occurred after the fraud misses the mark. Rather, the Government did not establish or even posit any facts which suggest that Columbus Commerce Center was intentionally positioned to receive TIF funds to unjustly keep them from Alliant as the fraud had not yet occurred when this structure was established. Therefore, absent evidence showing that Eisenga retained control over Columbus Commerce Center in order to carry out the subject injustice (*i.e.,* keeping TIF funds), the Government could not have met its burden of proof on the second element of the *Olsen* test.

### 2.    The Third Element: Cause

To establish the Third Element of the *Olsen* test, the Court needed to consider whether the control that the defendant exercised *caused* the injustice. In other words, the District Court needed to conclude that the Government must also show that Eisenga's control of First American Properties and/or Columbus Commerce Center was *causal* to the Government's inability to collect on the restitution order against him.

Assuming, *arguendo*, that directing the TIF funds to Columbus Commerce Center in 2012 had somehow been fraudulent or unjust, it cannot

be said that such an exercise of control *caused* Alliant or the Government to be unable to collect the funds. This is because, unlike in *Olen*, the TIF funds were never available to Alliant for collection, because it was always Columbus Commerce Center, not Eisenga, who had been entitled to them. In other words, unlike in *Olen*, there was not a switch in who was entitled to recover after the time that Alliant's entitlement arose. Therefore, the Government also failed to meet its burden on this final element of veil piercing and the District Court erred in concluding that it had done so.

## II. THE DISTRICT COURT ERRED BY FAILING TO ABSTAIN IN LIGHT OF ONGOING STATE COURT ACTION, UNDER *YOUNGER*.

The District Court also erred in failing to abstain from rendering an order in this issue under the *Younger* abstention doctrine. The District Court did not provide much insight on its reasoning for this conclusion.

The *Younger* abstention doctrine "directs federal courts to abstain from exercising jurisdiction over federal claims that seek to interfere with pending state court proceedings." *J.B. v. Woodard*, 997 F. 3d 714, 722 (7th Cir. 2021) (citing to *Younger v. Harris*, 401 U.S. 37 (1971)). *Younger* "holds that, if federal adjudication of an issue would interfere with a state court proceeding that satisfies the *Middlesex* factors, the federal court must abstain, unless an exception applies." *Berrada Properties Mgmt. Inc. v. Romanski*, 608 F. Supp. 3d 746, 751-52 (E.D. Wis. 2022) (citing to *Middlesex Cnty. Ethics Comm. v.*

*Garden State Bar Assoc.*, 457 U.S. 423, 432 (1982)).  The purpose of the *Younger* doctrine is to avoid federal intervention disrupting ongoing state court proceedings.  *Id.*  "Younger abstention is called for in exactly three classes of cases: where federal jurisdiction would intrude into ongoing state criminal proceedings, or into certain civil enforcement proceedings (judicial or administrative) akin to criminal prosecutions, or into civil proceedings 'that implicate a State's interest in enforcing the orders and judgments of its courts.'"  *Mulholland v. Marion Cnty. Election Bd.*, 746 F.3d 811, 815 (7th Cir. 2014) (quoting *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 70 (2013)).

In the related state civil lawsuit initiated by Alliant against Eisenga and Columbus Commerce Center over recovery of the TIF funds, a state court has entered judgment against Columbus Commerce Center and Eisenga for substantively the same question—whether funds held by Columbus Commerce Center are actually owed to Alliant Credit Union.  The judgment with regard to Columbus Commerce Center is currently pending appeal before the Wisconsin Court of Appeals.  By trying to make the same determination about the same pool of money, the District Court runs the risk of interfering with a state's interest in enforcing its orders and judgments—one of the exact risks which the *Younger* abstention doctrine is intended to avoid.

In light of these considerations, the District Court erred in failing to apply the *Younger* abstention doctrine and in ruling on the efforts to garnish funds held by Columbus Commerce Center, despite ongoing state court litigation which stands to be affected by its actions.

## CONCLUSION

Based upon the foregoing, the Court of Appeals should hold that the District Court erred in concluding that the Government met its burden of proof on the veil piercing claim and that, therefore, it erred in permitting the garnishment disposition against the funds of Columbus Commerce Center. It should also hold that the District Court erred by failing to adhere to the *Younger* abstention doctrine in light of the ongoing state court litigation. Therefore, this Court should remand with instruction to deny the Garnishment disposition order.

Dated at Waukesha, Wis. this 21st Day of June, 2024.

**CRAMER MULTHAUF LLP,**

By: *s/ Matthew M. Fernholz*
    Matthew M. Fernholz
    WI State Bar No. 1065765
    Domonic A. Burke
    WI State Bar No. 1104690
    *Attorneys for Defendant-Appellant,*
    *Michael Eisenga*

P.O. Address:
1601 E. Racine Ave., Ste. 200
P.O. Box 558
Waukesha, WI 53187
262-542-4278
mmf@cmlawgroup.com
dab@cmlawgroup.com

## CERTIFICATION OF COMPLIANCE WITH TYPE-VOLUME LIMIT

The undersigned counsel hereby certifies, under penalty of perjury, that:

1. This document complies with the word limit of Cir. R. 32(c) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) this document contains 6,938 words; and

2. This document complies with the typeface requirements of Cir. R. 32(b) because this document has been prepared in Microsoft Word in a proportionally spaced typeface using Times New Roman in 14 pt. regular font for the body, Times New Roman 12 pt. regular font for the block quotes, and Times New Roman 11 pt. regular font for the footnotes.

Dated at Waukesha, Wis. this 21st Day of June, 2024.

**CRAMER MULTHAUF LLP,**

By: _s/ Matthew M. Fernholz_
Matthew M. Fernholz
WI State Bar No. 1065765
Domonic A. Burke
WI State Bar No. 1104690
*Attorneys for Defendant-Appellant,*
*Michael Eisenga*

## TABLE OF CONTENTS – SHORT FORM APPENDIX

| | |
|---|---|
| RULE 30(D) CERTIFICATION | 1 |
| INDEX | 2 |
| GARNISHMENT DISPOSITION ORDER | App. 001 – 002 |
| ORDER GRANTING GOVERNMENT'S MOTION FOR A GARNISHMENT DISPOSIITION | App. 003 – 011 |
| TEXT ONLY ORDER FROM THE HEARING ON AUGUST 7, 2023 | App. 012 – 013 |
| EXCERPT OF TRANSCRIPT FROM HEARING ON AUGUST 7, 2023 [Page 9] | App. 014 – 015 |
| EXCERPT OF TRANSCRIPT FROM HEARING ON AUGUST 7, 2023 [Pages 18-21] | App. 016 - 020 |
| INDICTMENT | App. 021 - 024 |
| ORDER OF FORFEITURE – MONEY JUDGMENT | App. 025 – 026 |
| JUDGMENT IN A CRIMINAL CASE | App. 027 – 032 |
| DECLARATION OF SAM MILLER, CPA | App. 033 - 035 |

# CERTIFICATION OF COMPLIANCE WITH APPENDIX REQUIREMENTS

The undersigned counsel hereby certifies, under penalty of perjury, that:

1. All materials required to be included in the appendix, pursuant to Cir. R. 30(a) and 30(b), are included herein.

2. As this appendix includes, combined with the brief and short appendix, materials required to be included in a supplemental appendix under Cir. R. 30(b), that, pursuant Cir. R. 30(b)(7), the total number of pages of documents included in this appendix, sum to less than 50 pages.

Dated at Waukesha, Wis. this 21st Day of June, 2024.

**CRAMER MULTHAUF LLP,**

By: *Electronically signed by Matthew M. Fernholz*
Matthew M. Fernholz
WI State Bar No. 1065765
Domonic A. Burke
WI State Bar No. 1104690
*Attorneys for Defendant-Appellant,*
*Michael Eisenga*

# INDEX OF TRANSCRIPT EXCERPTS

| Event | Native Pg. No(s). | Appendix Page No(s). |
|---|---|---|
| Motion Hearing Held Before District Judge William M. Conley – Aug. 7, 2023 – ARGUMENT (R. 101)…………..……….. | ……..………9 | ………..App. 015 |
| Motion Hearing Held Before District Judge William M. Conley – Aug. 7, 2023 – ARGUMENT (R. 101)…………..……….. | …………18-21 | …..App. 017 - 020 |

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        Plaintiff,

    v.                              Case No. 20-cr-137-wmc

MICHAEL EISENGA,

        Defendant.

    and

CITY OF COLUMBUS,

        Garnishee Defendant.

## GARNISHMENT DISPOSITION ORDER

Upon the motion of the government and this court's Opinion and Order issued today, IT IS HEREBY ORDERED that:

1. The garnishee defendant, City of Columbus, SHALL withhold and retain all funds identified in its Answer of Garnishee, for remission of those funds to the Clerk of Court for the Western District of Wisconsin.

2. Those funds SHALL be made payable to the "Clerk of Court" and forwarded to the Clerk of Court, 120 North Henry Street, Room 320, Madison, Wisconsin 53703. Defendant's name and case number should also be referenced on the check payment.

3.    The Clerk of Courts SHALL then apply those funds toward defendant's ongoing restitution obligation consistent with the terms of his sentencing.

<u>THIS WRIT OF GARNISHMENT IS CONTINUING AND MAY ONLY TERMINATE BY</u>:

    A.  A COURT ORDER QUASHING THE WRIT OF GARNISHMENT;

    B.  EXHAUSTION OF PROPERTY IN THE POSSESSION, CUSTODY, OR CONTROL OF THE GARNISHEE IN WHICH THE DEBTOR HAS A SUBSTANTIAL NONEXEMPT INTEREST (INCLUDING NONEXEMPT DISPOSABLE EARNINGS), UNLESS THE GARNISHEE REINSTATES OR REEMPLOYS THE JUDGMENT DEBTOR WITHIN 90 DAYS AFTER THE JUDGMENT DEBTOR'S DISMISSAL OR RESIGNATION; OR

    C.  SATISFACTION OF THE DEBT WITH RESPECT TO WHICH THE WRIT IS ISSUED.

Entered this 30th day of April, 2024.

                    BY THE COURT:

                    /s/

                    _____

                    WILLIAM M. CONLEY
                    District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

                          Plaintiff,                          OPINION AND ORDER

          v.
                                                              20-cr-137-wmc

MICHAEL EISENGA,

                          Defendant.

On March 25, 2021, Michael Eisenga pleaded guilty to one count of engaging in a scheme to defraud Alliant Credit Union in violation of 18 U.S.C. § 1344(2).  The court sentenced Eisenga to 42 months in prison and ordered him to pay $4,027,035.51 in restitution to Alliant.  (Dkt. #39.)  To satisfy a small part of that obligation, the government moved for an order of garnishment on approximately $110,000 in tax increment financing payments soon to be owed by the City of Columbus to an entity closely associated with Eisenga -- Columbus Commerce Center LLC.  (Dkt. #65.) Following two hearings on the motion, and the parties' subsequent, supplemental briefing, the court will grant the motion.

BACKGROUND[1]

Before his conviction, Eisenga had been a real estate investor who made money by forming various limited liability companies for the purpose of real estate development, ownership, and leasing.  Among his principal, remaining assets is a living trust formed for his benefit by his deceased father, which apparently remains outside the reach of his

---

[1] The court takes the following background facts from the parties' filings and exhibits and, where indicated, from publicly available, state-court records.

creditors.  Eisenga also still has control of First American Properties, LLC, of which his living trust is the sole member.  First American was organized in 2005 and remains a holding entity for five other LLCs, including:  Columbus Commerce Center; Mayville Holdings, an assisted living facility operated by another of the LLCs, Advantage Management Mayville; Wildwood Estate, a lakefront vacation home and rental property; and CMB Ventures, an office and light industrial rental property.  Profits from these subsidiaries are passed to First American as appropriate, just as First American can transfer money into one of its five subsidiaries.

Most relevant here, Columbus Commerce Center was organized in 2007 to own and develop a commercial property as part of a tax increment financing ("TIF") district in the City of Columbus.  More specifically, as the parent company, First American had entered into an agreement with Columbus to develop this property in exchange for deferred taxes and TIF incentive payments that would come due as the city received property taxes levied on the real property located within the Columbus Commerce development.  First American then assigned its rights and obligations under the TIF agreement to Columbus Commerce in 2009, including its entitlement to the TIF incentive payments.  In 2012, the original parcels described in the development agreement were split further into smaller lots, and a building for a grocery store was built on the lot that became known as "150 Commerce Drive" ("the Property").

In 2014, CCC Lot 2, LLC, which was also controlled by Eisenga, acquired title to the Property, but was not made a party to the TIF agreement with the city.  Three years later, in 2017, Eisenga convinced Alliant to loan him $6,975,000.00 in reliance on

2

fraudulent lease documents and secured the loan with a mortgage on the property. That conduct led to the criminal charge in this case. When CCC Lot 2 defaulted on the loan, Alliant began foreclosure proceedings in state court in 2019, putting the Property into receivership. Even though Alliant began to pay the real estate taxes on the Property, when Eisenga invoiced the city for TIF payments on the Property under the agreement in July 2019 and February 2020, the city issued the payments to Columbus Commerce.

Alliant next filed a civil lawsuit in state court against Eisenga, the city, and Columbus Commerce to recover those two payments. However, in response, Eisenga represented that he kept and used those funds in his overall business entity, supposedly based on his attorney advising that Alliant had no legal claim to any TIF payments. The city was later dismissed from that lawsuit, and the state court entered default judgment against the remaining defendants on October 31, 2023.[2] At this point, Columbus Commerce appears to exist only to collect the TIF incentive payments. Indeed, it has no shareholders, employees, accounts receivables, customers, or creditors; nor does it own any property. In this lawsuit, therefore, the government seeks to garnish the four, remaining TIF payments still due to Columbus Commerce, which the city is withholding from anyone pending further direction from this court.[3]

---

[2] *See* public docket information for Columbia County Case No. 2021-CV-109, available at https://wcca.wicourts.gov/case.html. As of April 30, 2024, Eisenga and Columbus Commerce had appealed the state circuit court's denial of their motion to vacate default judgment and to reopen the case. *See Alliant Credit Union v. Columbus Commerce Center, LLC*, Appeal No. 2024AP457.

[3] Additional facts are discussed below as relevant.

OPINION

This court previously rejected two of defendant's arguments that: (1) the doctrines of issue and claim preclusion bar the government's request; and (2) the court should abstain here because of any related state court proceedings. (*See* dkt. #78.)  Thus, there is one remaining issue for this court to address:  whether the corporate veil should be "reverse pierced" to allow the remaining TIF incentive payments due Columbus Commerce to be garnished by the government to satisfy defendant's restitution obligation to Alliant. Because piercing the corporate veil is governed by state law, *Prince v. Appleton Auto, LLC*, 978 F.3d 530, 536 (7th Cir. 2020), the court looks to Wisconsin state law to answer the question in this case.  Since the piercing doctrine can be applied in reverse to reach the assets of a controlled entity under Wisconsin law, *Olen v. Phelps*, 200 Wis.2d 155, 546 N.W. 2d 176, 181 (Wis. Ct. App. 1996), this initial hurdle is easily cleared.  However, the question as to whether the requirements for piercing are met calls for further discussion.

To begin, the Wisconsin Supreme Court "recognizes that the corporation is a separate entity and is treated as such under all ordinary circumstances." *Fontana Builders, Inc. v. Assurance Co. of Am.*, 369 Wis.2d 495, 882 N.W.2d 398, 414 (2016) (citation and internal quotation marks omitted).  Accordingly, to obtain a "piercing of the corporate veil" here, the government must prove three separate elements.  *First*, there must be "[c]ontrol, not mere majority or complete stock control, but complete domination, not only of finances but of policy and business practice [with] respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own." *Consumer's Co-op. of Walworth Cnty. v. Olsen*, 142 Wis.

4

2d 465, 484, 419 N.W.2d 211 (1988).  *Second*, "[s]uch control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or dishonest and unjust act in contravention of plaintiff's legal rights." *Id.*  And *third*, "[t]he aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of."  *Id.*

As to the first factor, the degree of control defendant Eisenga has and does exercise over First American and its subsidiaries readily supports the conclusion that they are alter egos.  In determining whether to disregard the corporate form, the court considers:  failure to observe corporate formalities; non-payment of dividends; siphoning of funds of the corporation by the dominant stockholder; non-functioning of other officers or directors; and the absence of corporate records.  *Olen*, 546 N.W. 2d at 180-81 (citing *United States v. Pisani*, 646 F.2d 83, 88 (3rd Cir. 1981)).  Based on the evidence provided, it is plain that defendant observes few, if any, corporate formalities, as well as mixes personal and business assets.  For example, defendant is the sole owner of First American *and* all of its subsidiaries, including Columbus Commerce.  As for other employees, he notes that he, his bookkeeper, and his operations manager must approve an invoice as a business expense before it is paid.  At his depositions, defendant also testified that:  he holds meetings for his LLCs only "sometimes," without taking minutes; he does not take a salary or a draw; and he also uses First American funds to pay his personal expenses as needed despite his subsidiary LLCs being the only source of funds.  (Dkt.  #86 at 16:11-16; dkt. #85 at 7:5-8:7.)  Thus, the operations and finances of these companies are overlapping and comingled.

More specifically, defendant explained that he or his bookkeeper transfers money from the First American business account into his personal account whenever he has to pay personal bills or expenses. (Dkt. #85 at 7:5-8:7, 46:1-5.) And his bookkeeper, who monitors his personal account, knew to transfer First American funds into his personal account if she saw that it was overdrawn. (*Id.* at 46:8-47:11.) Indeed, occasionally either defendant or the bookkeeper would pay defendant's personal expenses directly out of the business account, including a health insurance premium (*id.* at 145:24-146:2), a child support payment (*id.* at 144:13-20), and a mortgage payment on farmland (*id.* at 141:1-9). Defendant also loaned himself about $11,000 from First American to buy a car for his teenage son to use, which he paid for with a check from the business, only for his father to later repay to the business. (*Id.* at 26:8-27:23.) Similarly, defendant insures that car and two other vehicles under a policy paid for by First American and associated with Wildwood Estates, which owns a rental property defendant uses occasionally without reimbursement. (*Id.* at 29:3-16; 77:4-8.) Finally, another subsidiary, CMB Ventures, paid the mortgage on a building defendant owned personally. (*Id.* at 13:3-19.) After defendant was released to home confinement, he opened a credit card for personal expenses that the bookkeeper also paid directly out of the First American account, which occurred four or five more times before defendant told her to stop. (*Id.* at 17:16-19:23.) The bookkeeper further knew to transfer excess funds from one of defendant's other businesses into First American's bank account before transferring funds to his personal account if there were insufficient funds in the First American account. (*Id.* at 67:10-68:6.)

Thus, defendant has "failed to draw the line between his individual and corporate affairs and is in a poor position to ask the court to do so." *Wiebke v. Richardson & Sons, Inc.*, 83 Wis.2d 359, 364, 265 N.W.2d 571, 574 (1978).  In particular, Wisconsin courts have declined to recognize a corporation's separate existence in similar circumstances.  In *Wiebke*, the Wisconsin Supreme Court found that a corporation did not have an existence apart from its sole stockholder who "used the corporate checking account as his personal checking account," "seldom took wages," "did not make regular additions to the corporate account to repay the amount he withdrew" and whose "finances and those of the corporation were [thus] one and the same." *Id.*  So, too, in *Olen*, the Wisconsin Court of Appeals applied "reverse piercing" where the sole shareholder and director paid profits from his accounting firm's operations to his wife's personal account and directly to his creditors to satisfy personal and business debts.  200 Wis.2d at 159, 546 N.W.2d at 179.

Still, defendant argues that the government has not met its burden of showing his control over and lack of separation of operations, responsibilities, and finances.  However, even if the court were to disregard the government's evidence and argument with respect to defendant's control of the Wildwood subsidiary (as defendant argues the court should), there is certainly sufficient evidence of his control over First American and Columbus Commerce, as a subsidiary that exists only to accept TIF payments for passing on to First American, for which garnishment is allowed under Wisconsin law.  Defendant further argues that his deposition testimony aside, the evidence shows that:  transfers of funds from First American to him merely constitute "draws"; he provides a declaration from his accountant validating his internal business accounting practices; and he notes that

7

Wisconsin state law does not require him to observe all corporate formalities.  However, any legal validity for his practices does not detract from the amount of control defendant exerts over his businesses.  Nor does the fact that business expenses have to be approved by defendant as well as his operations manager and bookkeeper, take away from the fact that defendant's sole control is evidenced by his use of his business funds to pay personal expenses, the unqualified directions he gives to his accountant and operations manger; and operations directed to defendant's immediate gratification of personal wants and needs, rather than the long term growth of any of the entities under his control.

Finally, defendant emphasizes that he pays his expenses from his personal bank account and plans to pay back the money First American has loaned him.  However, there is no evidence he has done so regularly so far, if at all; his personal bank account is directly funded by the business account; and he has also paid some personal expenses directly from his business account.

As for the second and third elements, a defendant must exercise control in furtherance of an illegal, unjust, or dishonest purpose that causes harm or injury.  In other words, the corporate form will be disregarded if it "is used to evade an obligation, to gain an unjust advantage or to commit an injustice."  *Wiebke*, 83 Wis. 2d at 363, 265 N.W. 2d at 573.  As noted above, Columbus Commerce exists solely to receive TIF incentive payments from the city, which defendant can then quickly funnel up to First American, over to other subsidiaries or into his own, personal accounts.  However, the victim credit union, Alliant, made the ongoing property tax payments keeping the TIF payments due and payable to defendant on invoices and collections made *after* he defrauded Alliant.  Yet

8

defendant seeks those the city is still holding for Columbus Commerce pending further order of this court.

Finally, defendant argues his attorney advised that Alliant had no legal claim to the TIF payments under contract law or by means of any pledge, assignment or lien (*see* dkt. #32-1 at 1), but the question here is different.  Although defendant notes that the decision to route the TIF payments to Columbus Commerce predates his fraud, the evidence shows the amounts only became payable to Columbus Commerce because Alliant paid property taxes, and defendant, knowing this, sought to keep all TIF payments, ignoring his and his companies' criminal restitution obligations.  The court will, therefore, allow the victim credit union to recover the four, remaining TIF payments to the detriment of Eisenga and his many other creditors.[4]

### ORDER

IT IS ORDERED that the government's motion for a garnishment disposition order (dkt. #65) is GRANTED and an order of garnishment shall issue promptly.

Entered this 30th day of April, 2023.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge

---

[4] In so ruling, however, the court does not opine on the propriety of garnishing any of defendant's other assets held by First American or its subsidiaries.

## Notice of Electronic Filing

The following transaction was entered on 8/7/2023 at 4:20 PM CDT and filed on 8/7/2023

**Case Name:** United States of America v. Eisenga, Michael

**Case Number:** 3:20-cr-00137-wmc

**Filer:**

**Document Number:** 78(No document attached)

**Docket Text:**

**\*\* TEXT ONLY ORDER \*\***
**The court held a hearing on the government's motion for garnishment on August 7, 2023. (Dkt. [65].) Attorneys Heidi Luehring and Meredith Duchemin appeared on behalf of the government and Attorney Matthew Fernholz appeared on behalf of defendant Michael Eisenga. During the hearing, the court rejected defendant's argument that proceedings in state court establishing that the City of Columbus could not be negligent in making tax incremental payments to Columbus Commerce Center, LLC as having no direct bearing on the question of the right of the United States to garnish those same payments if the LLC is now the alter ego of defendant Eisenga. Accordingly, the court finds that the doctrines of issue and claim preclusion are not applicable here nor is there any reason to abstain under *Younger* simply because the victim is attempting to pursue judgment against CCC in state court. *See U.S. v. Vitek Supply Corp.*, 151 F.3d 580, 586 (7th Cir. 1998) (noting that the United States may always litigate in its own courts). That said, the question remains whether the LLC is defendant's alter ego so that the corporate veil should be pierced to allow garnishment of the payments due to that entity. *E.g., U.S. v. Rice*, 2009 WL 10697403, at \*2 (S.D. Iowa, Aug. 7, 2009) (allowing garnishment of grain being held by a cooperative found to be the defendant's alter ego). The parties agree that there is a dispute of fact on that issue and have been directed to expedite discovery and to arrange for an evidentiary hearing to be held on a date no later than August 31, 2023. The failure of either side to proceed in good faith is grounds for either party to seek further relief in this court. Signed by District Judge William M. Conley on 8/7/2023. (rks)**

**3:20-cr-00137-wmc-1 Notice has been electronically mailed to:**

Heidi Luehring     heidi.luehring@usdoj.gov, CaseView.ECF@doj.gov, USAWIW.EFILE@usdoj.gov, amber.frieden@usdoj.gov, morgan.maloney@usdoj.gov

Christopher T. Van Wagner (Terminated)     chris@chrisvanwagner.com, Joleen@chrisvanwagner.com

Meredith P. Duchemin     Meredith.Duchemin@USDOJ.gov, CaseView.ECF@usdoj.gov,

Heidi.Luehring@usdoj.gov, Janeen.Hutchinson@usdoj.gov, andrea.erickson@usdoj.gov, bridget.fitzgerald@usdoj.gov, jennifer.frank@usdoj.gov, judy.seston@usdoj.gov, usawiw.efile@usdoj.gov

William H Gergen (Terminated)     ggpsc1@sbcglobal.net

Matthew Martin Fernholz     mmf@cmlawgroup.com, ty@cmhlaw.com

Domonic Arthur Burke     dab@cmlawgroup.com, amy@cmlawgroup.com

**3:20-cr-00137-wmc-1 Notice will be delivered by other means to::**

**Transcript of**
**Motion Hearing Held Before District Judge William M. Conley**
**Aug. 7, 2023**
**(R. 101)**

[Page 9]

1    negligent for failing to do that.  And Alliant elected not to

2    appeal that decision.

3         THE COURT:  And I don't think there's a claim or issue

4    preclusion on the United States because they weren't party to the

5    lawsuit.  They are able to assert their positions, and I don't

6    know that they would be blocked by the victim's failure to obtain

7    it.  But it really does matter, evidentiary -- as an evidentiary

8    matter whether it's an on- -- a going concern.  And what are

9    those payments being used for if not to repay amounts owed to the

10   victim?

11        MR. FERNHOLZ:  Well, so, Judge, I think that goes to the

12   problem with the burden of proof on this motion, which is the

13   Court has zeroed in on this is effectively a veil-piercing,

14   alter-ego argument, and to make that sort of argument, you'd need

15   some sort of evidentiary record.  And the government didn't

16   create that.  It went ahead and filed the motion.  It found out

17   about the funds and then moved forward as if it were self-evident

18   that it could garnish from a separate LLC on a restitution order

19   against Mr. Eisenga personally.  And so with the government

20   having the burden here, they just haven't met it.

21        MS. LUEHRING:  Your Honor --

22        THE COURT:  Yes.

23        MS. LUEHRING:  -- may I interrupt for just a minute?

24        THE COURT:  Well, you're not interrupting.  I'm going to

25   come back to you.

**Transcript of**
**Motion Hearing Held Before District Judge William M. Conley**
**Aug. 7, 2023**
**(R. 101)**

***Pages 10-17 Omitted***

[Pages 18-21]

1        THE COURT:  That wasn't before the state court.  The state

2    court didn't decide whether -- whether garnishment of a criminal

3    defendant was appropriate under these circumstances.  They

4    decided that the City of Columbus wasn't a proper party to that

5    lawsuit.

6        MR. FERNHOLZ:  Because it had no obligation to make the --

7    the payment.  There's no negligence in it's making the payment to

8    the LLC.  That was Alliant's argument.

9        THE COURT:  Right.  But that doesn't -- so they're not

10   negligent in making the payments, but there's still a question

11   about whether the victim -- the criminal victim can garnish those

12   payments.

13       MR. FERNHOLZ:  Well, then, Judge --

14       THE COURT:  And I don't know how that wouldn't be the case

15   if it's appropriate to pierce the corporate veil.

16       MR. FERNHOLZ:  And that's why I think we turn to then the

17   younger abstention doctrine, which is --

18       THE COURT:  And I'm not abstaining based on the fact that

19   the -- the State Court simply said -- and it's no longer being

20   litigated -- that there isn't a direct claim against the city for

21   making payments it's obligated to make.

22       MR. FERNHOLZ:  Well, but the -- Alliant is still proceeding

23   against the LLC that is subject to the garnishment.  So I think

24   that was the -- the Court's question --

25       THE COURT:  It's a -- it's a stretch under *Younger*, and I'm

1    not going to abstain.  The question is whether or not these are

2    essentially moneys that are flowing to your client.

3         Is -- if it's not receiving income, does the LLC own

4    anything?

5         MR. FERNHOLZ:  It -- I believe it owns the lots that are --

6    that were subject to the development.

7         THE COURT:  But they were foreclosed on?

8         MR. FERNHOLZ:  I think one of them was foreclosed on.  I

9    don't know if both of them were, Judge.

10        THE COURT:  Do you know, Ms. Duchemin?

11        MS. DUCHEMIN:  I don't, Your Honor.  And -- and I guess I

12   have to say, like I said, we -- we assumed differently.  It's --

13   it's hard for the government in this position because he's still

14   a criminal defendant.  I -- I feel --

15        THE COURT:  Well, he's --

16        MS. DUCHEMIN:  There's a limit in --

17        THE COURT:  -- convicted.

18        MS. DUCHEMIN:  He is, but I mean, there's a limit in what

19   information I can get from him.  But because his lawyer said --

20        THE COURT:  Well, there would be if he were asserting the

21   Fifth Amendment, but I don't know why that would be applicable

22   here.  He's already been convicted.

23        MS. DUCHEMIN:  Well, and I was just going to get to that in

24   that since counsel has said, "Okay.  We're okay with discovery,"

25   I guess what I would propose is I don't think there's a good

1    evidentiary record here either way.  You got -- you got both

2    sides saying, "I'm not sure," "maybe," "possibly, but I don't

3    want go on the record."

4        I think we should have an evidentiary hearing.  I think the

5    defendant should be here.  I think we should be able to subpoena

6    information.  It's relevant to not only whether the garnishment

7    is appropriate, but whether or not the defendant's claim of

8    poverty at sentencing was true or whether or not he now has

9    assets because he's got an ongoing business that's earning

10   income, that the Court ought to consider in changing the original

11   judgment and order him to pay more money.

12       THE COURT:  What is his current status?  How soon before

13   he's released?

14       MR. FERNHOLZ:  He --

15       MS. DUCHEMIN:  I believe it's October.

16       MR. FERNHOLZ:  He's under house arrest currently, Judge.

17       THE COURT:  I'm inclined to agree.  We need to have an

18   evidentiary hearing.  Do you have a different position?

19       MR. FERNHOLZ:  No, I don't, Judge.  I mean, I don't think

20   the -- the record before the Court does not support the

21   government's position today, and I think it can deny the motion

22   that's been filed.

23       THE COURT:  Well, I'm not going to deny it when I don't know

24   whether -- what the situation is with respect to the corporate

25   veil, and I'm willing to hold an evidentiary hearing on that.

```
 1       You'll need to -- I guess we don't really need to writ him out,
 2       since he's on home arrest.  And he's subject to the Court's
 3       jurisdiction, but I expect he will be here in person at the
 4       evidentiary hearing.  It looks like Thursday would be the
 5       appropriate time.
 6            Does the government have a preference as to timing?
 7            MS. DUCHEMIN:  Your Honor, I'm available Thursday.  I just
 8       want to make sure that we have enough time to get the information
 9       the Court needs because I'll have to serve the company through
10       defense counsel, I assume, and they'll have to gather the
11       information.  I think we -- I think we may need a little more
12       time logistically.
13            THE COURT:  Well, you can serve a subpoena.
14            MS. DUCHEMIN:  Yep.
15            THE COURT:  But how much time would we need to gather that?
16       When's the -- when's the next payment due?
17            MS. DUCHEMIN:  I believe his payments aren't due until --
18       usually it's a month after he gets out of confinement.  And the
19       way the BOP reads it, he's still technically in confinement
20       because he's under home -- house arrest.  When I looked at the
21       BOP website, he is still technically in custody till October.  So
22       I believe his first payment would be due in November.
23            THE COURT:  So --
24            MS. DUCHEMIN:  Ish.
25            THE COURT:  So that -- here's what I'm going to do:  Counsel
```

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

DOC NO
REC'D / FILED

2020 OCT 22 PM 2: 09

PETER OPPENEER
CLERK US DIST COURT
WD OF WI

| | |
|---|---|
| UNITED STATES OF AMERICA | INDICTMENT |
| v. | Case No. 20 CR 137 WMC |
| MICHAEL EISENGA, | 18 U.S.C. § 1344(2) |
| | 18 U.S.C. § 2 |
| | 18 U.S.C. § 981(a)(1)(C) |
| Defendant. | 18 U.S.C. § 982 |
| | 28 U.S.C. § 2461(c) |

THE GRAND JURY CHARGES:

## COUNT 1

1.      At times material to this indictment:

      a.      Defendant MICHAEL EISENGA operated CCC Lot 2, LLC, a limited liability company with its principal place of business in Columbus, Wisconsin.

      b.      Alliant Credit Union (Alliant) was a financial institution, as defined in Title 18, United States Code, Section 20, with a location in Rolling Meadows, Illinois, the accounts of which were insured by the National Credit Union Share Insurance Fund.

2.      During the period from in or before August 2016 to on or about January 16, 2019, in the Western District of Wisconsin and elsewhere, the defendant,

MICHAEL EISENGA,

with the intent to defraud, engaged in a scheme to defraud Alliant and to obtain money owned by Alliant and under their custody and control, by means of materially false and

fraudulent pretenses and representations as set forth below, knowing that said pretenses and representations were false when made.

3.      It was part of the scheme to defraud that on behalf of CCC Lot 2, EISENGA sought a mortgage loan from Alliant for commercial properly located in Columbus, Wisconsin.  In connection with the loan application, EISENGA falsely represented to Alliant that CCC Lot 2 had already secured Festival Foods, Inc. as a tenant for the property through a 20-year lease agreement and that another company, Supervalue Holdings, Inc., had guaranteed the lease.

4.      It was further part of the scheme to defraud that EISENGA provided Alliant with two signed documents he represented to be CCC Lot 2's lease with Festival Foods, Inc. and the guarantee from Supervalue Holdings, Inc., however neither of the documents were genuine.  No lease ever existed between CCC Lot 2 and Festival Foods, Inc., and Supervalue Holdings, Inc. never guaranteed any lease with CCC Lot. 2.

5.      Relying on EISENGA's false representations and documents, Alliant approved CCC Lot 2 for the loan on February 2, 2017.  The loan closed on March 3, 2017, and Alliant paid out loan proceeds of approximately $6.9 million.

6.      It was further part of the scheme to defraud that on January 16, 2019, after CCC Lot 2 defaulted on the loan, EISENGA provided Alliant with a Lease Cancellation Agreement, purporting to be an agreement terminating CCC Lot 2's lease with Festival Foods, Inc., effective February 28, 2018, however the document was not genuine.

7.      On or about March 3, 2017 in the Western District of Wisconsin, the defendant,

App. 022

MICHAEL EISENGA,

knowingly executed the above-described scheme by signing the loan closing documents

on behalf of CCC Lot 2 at a title company in Madison, Wisconsin.

(All in violation of Title 18, United States Code, Sections 1344(2) & 2).

<u>FORFEITURE ALLEGATION</u>

1.      The allegations above are re-alleged and incorporated here for the

purpose of alleging forfeitures pursuant to Title 18, United States Code, Sections

981(a)(1)(C), 982 and Title 28, United States Code, Section 2461(c).

2.      Upon conviction of the offense in COUNT 1, the defendant, MICHAEL

EISENGA, shall forfeit to the United States of America, pursuant to Title 18, United

States Code, Sections 981(a)(1)(C), 982, and Title 28, United States Code, Section 2461(c),

any property, real or personal, which constitutes or is derived from proceeds traceable

to the scheme to defraud described above.  The property to be forfeited includes, but is

not limited to, the following:

      a.      Money Judgment – a sum of money equal to $6.9 million in United

States currency, representing the amount of proceeds obtained as a result of the scheme

to defraud.

3.      If any of the property described above, as a result of any act or

omission of the defendant:

      a.      cannot be located upon the exercise of due diligence;

      b.      has been transferred or sold to, or deposited with, a third party;

      c.      has been placed beyond the jurisdiction of the court;

3

    d.      has been substantially diminished in value; or

    e.      has been commingled with other property which cannot be divided

without difficulty, the United States of America shall be entitled to forfeiture of

substitute property pursuant to Title 21, United States Code, Section 853(p), as

incorporated by Title 18, United States Code, Section 982(b)(1) and Title 28, United

States Code, Section 2461(c).

A TRUE BILL

_____
PRESIDING JUROR

Indictment returned: _10_/_22_/_2020_

_____
SCOTT C. BLADER
United States Attorney

4

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

v.                                   Case No. 20-cr-137-wmc

MICHAEL EISENGA,

Defendant.

---

ORDER OF FORFEITURE – MONEY JUDGMENT

---

Based upon the motion of the United States, the Court finds that:

1.      On October 22, 2020, a federal grand jury sitting in Madison, Wisconsin returned an indictment against Michael Eisenga.    The one-count indictment charged a violation of 18 U.S.C. § 1344(2).    The indictment also contained a forfeiture allegation for the forfeiture of any and all property constituting or derived from proceeds obtained directly or indirectly as a result of the said violation, including but not limited to a money judgment in a sum of money equal to $6.9 million in United States currency, representing the amount of proceeds obtained as a result of scheme to defraud. ECF. No. 2.

2.      On March 25, 2021, the defendant pleaded guilty to the one-count indictment. In the plea agreement, the defendant agreed that he obtained proceeds of $6,975,000.00 from the violations of 18 U.S.C. § 1344(2).    ECF. Nos. 17 and 22.

3.      The United States has not, as of this date, identified specific assets that were derived from the offense of which the defendant has been convicted.    Nor has the

United States identified any property of the defendants that could be forfeited as a substitute asset in accordance with 21 U.S.C. § 853(p).

     4.     Accordingly, the United States seeks the entry of an Order of Forfeiture consisting of a personal money judgment against defendant Michael Eisenga in the amount of $4,027,035.51.

     5.     Pursuant to Rule 32.2(c)(1) "no ancillary proceeding is required to the extent that the forfeiture consists of a money judgment."

IT IS THEREFORE ORDERED:

     1.     The defendant Michael Eisenga shall forfeit to the United States the sum of $4,027,035.51 pursuant to 18 U.S.C. § 981(a)(1)(C), 18 U.S.C. § 982, and 28 U.S.C. § 2461(c).

     2.     The United States District Court shall retain jurisdiction in the case for the purpose of enforcing this Order; and

     3.     Pursuant to Rule 32.2(b)(4), this Order of forfeiture shall become final as to defendant at the time of his sentencing.

     4.     The United States may, at any time, move pursuant to Rule 32.2(e) to amend this Order of Forfeiture to substitute property having a value not to exceed $4,027,035.51 to satisfy the money judgment in whole or in part.

DATED: June 29, 2021

WILLIAM M. CONLEY
United States District Judge

2

App. 026

# United States District Court
## Western District of Wisconsin

| UNITED STATES OF AMERICA | **JUDGMENT IN A CRIMINAL CASE** |
| --- | --- |
| | (for offenses committed on or after November 1, 1987) |
| V. | **Case Number:**  0758 3:20CR00137-001 |
| Michael Eisenga | **Defendant's Attorney:**  Christopher Van Wagner |

Defendant, Michael Eisenga, pleaded guilty to Count 1 of the indictment.

Defendant has been advised of his right to appeal.

**ACCORDINGLY**, defendant is adjudicated guilty of the following offense(s):

| Title & Section | Nature of Offense | Date Offense Concluded | Count Number(s) |
| --- | --- | --- | --- |
| 18 U.S.C. §§ 1344(2) & 2 | Loan Fraud, Class B felony | January 16, 2019 | 1 |

Defendant is sentenced as provided in pages 2 through 6 of this judgment.   The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

**IT IS FURTHER ORDERED that defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.   If ordered to pay restitution, defendant shall notify the court and United States Attorney of any material change in defendant's economic circumstances.**

| | |
| --- | --- |
| **Defendant's Date of Birth:** ██████ 1971 | June 23, 2021 |
| | Date of Imposition of Judgment |
| **Defendant's USM No.:**  22263-509 | |
| | /s/ William Conley |
| **Defendant's Residence Address:** ██████████ Columbus, WI  53925 | |
| | William M. Conley |
| **Defendant's Mailing Address:**  Same as above | District Judge |
| | June 29, 2021 |
| | Date Signed: |

App. 027

AO 245 B (Rev. 3/01)(N.H. Rev.)

DEFENDANT:   MICHAEL EISENGA
CASE NUMBER:   0758 3:20CR00137-001

Judgment - Page 2

# IMPRISONMENT

As to Count 1 of the indictment, it is adjudged that defendant is committed to the custody of the Bureau of Prisons for a term of 42 months.  It is recommended that he be placed at an appropriate institution as close to his children in Columbus, Wisconsin, as possible.

I also recommend that defendant be afforded prerelease placement in a residential reentry center with work release privileges.

Defendant is neither a flight risk nor a danger to the community.   Accordingly, execution of the sentence of imprisonment is stayed until July 30, 2021, between the hours of noon and 2:00 p.m., when defendant is to report to the designated institution which will be identified by further court order. The present release conditions are continued until his voluntary surrender on July 30, 2021.

The U.S. Probation Office is to notify local law enforcement agencies, and the state attorney general, of defendant's release to the community.

# RETURN

**I have executed this judgment as follows:**

_____

_____

_____

Defendant delivered on _____ to _____

at _____, with a certified copy of this judgment.

_____
United States Marshal

By _____
Deputy Marshal

App. 028

AO 245 B (Rev. 3/01)(N.H. Rev.)

DEFENDANT:   MICHAEL EISENGA
CASE NUMBER:   0758 3:20CR00137-001

Judgment - Page 3

# SUPERVISED RELEASE/PROBATION

Defendant's term of imprisonment is to be followed by a five-year term of supervised release during which he will be subject to the statutory mandatory conditions of supervision.   In light of the nature of the offense and defendant's personal history, I adopt condition numbers 1 through 4 and 7 through 16 as proposed and justified in the presentence report, noting that neither party has raised any objections to those proposals.

If, when defendant is released from confinement to begin his term of supervised release, either he or the supervising probation officer believes that any of the conditions imposed today are no longer appropriate, either one may petition the Court for review.

Defendant is to abide by the statutory mandatory conditions.

## Statutory Mandatory Conditions

Defendant shall not commit another federal, state, or local crime. [Note: Any defendant that has been convicted of a felony offense, or is a prohibited person, shall not possess a firearm, ammunition, or destructive device pursuant to 18 U.S.C. §§ 921 and 922.]

The instant offense is not drug related and defendant has no history of drug use. Therefore, the requirement for drug testing set forth at 18 U.S.C. § 3583(d) is waived.

Defendant shall cooperate with the collection of DNA by the U.S. Justice Department and/or the U.S. Probation and Pretrial Services Office as required by Public Law 108-405.

If this judgment imposes a fine or a restitution obligation, it shall be a condition of supervised release that defendant pay any such fine or restitution that remains unpaid at the commencement of the term of supervised release in accordance with the Schedule of Payments set forth in the Financial Penalties sheet of this judgment.

Defendant shall comply with the standard and special conditions that have been adopted by this court.

## Standard Conditions of Supervision

1) Defendant shall not knowingly leave the judicial district in which defendant is being supervised without the permission of the Court or probation officer;

2) Defendant is to report to the probation office as directed by the Court or probation officer and shall submit a complete written report within the first five days of each month, answer inquiries by the probation officer, and follow the officer's instructions.   The monthly report and the answer to inquiries shall be truthful in all respects unless a fully truthful statement would tend to incriminate defendant, in violation of defendant's constitutional rights, in which case defendant has the right to remain silent;

3) Defendant shall maintain lawful employment, seek lawful employment, or enroll and participate in a course of study or vocational training that will equip defendant for suitable employment, unless excused by the probation officer or the Court;

4) Defendant shall notify the probation officer within seventy-two hours of any change in residence, employer, or any change in job classification;

5) Not imposed;

6) Not imposed;

App. 029

7)   Defendant shall not meet, communicate, or spend time with any persons defendant knows to be engaged in criminal activity or planning to engage in criminal activity;

8)   Defendant shall permit a probation officer to visit defendant at home, work, or at some other mutually convenient location designated by the probation officer at any reasonable time and shall permit confiscation of any contraband observed in plain view by the probation officer;

9)   Defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

10)   Defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the Court;

11)   Defendant shall report to the probation office in the district to which defendant is released within 72 hours of release from the custody of the Bureau of Prisons, unless instructed by a U.S. probation officer to report within a different time frame; and

12)   Defendant shall not possess a firearm, ammunition, destructive device, or dangerous weapon.

### Special Conditions of Release

13) Provide the supervising U.S. Probation Officer any and all requested financial information, including copies of state and federal tax returns.

14) Refrain from incurring new credit charges, opening additional lines of credit, or opening other financial accounts without the prior approval of the supervising U.S. Probation Officer.

15) Not transfer, give away, sell or otherwise convey any asset worth more than $200 without the prior approval of the supervising U.S. Probation Officer.

16) Refrain from seeking or maintaining any employment that includes unsupervised financial or fiduciary-related duties without the prior approval of the supervising U.S. Probation Officer.

ACKNOWLEDGMENT OF CONDITIONS

I have read or have had read to me the conditions of supervision set forth in this judgment, and I fully understand them. I have been provided a copy of them.   I understand that upon finding a violation of probation or supervised release, the Court may (1) revoke supervision, (2) extend the term of supervision, and/or (3) modify the conditions of supervision.

_____          _____
Defendant                                                              Date

_____          _____
U.S. Probation Officer                                              Date

# CRIMINAL MONETARY PENALTIES

Defendant shall pay the following total financial penalties in accordance with the schedule of payments set forth below.

| Count | Assessment | Fine | Restitution |
|---|---|---|---|
| 1 | $100.00 | $0.00 | $4,027,035.51 |
| **Total** | $100.00 | $0.00 | $4,027,035.51 |

It is adjudged that defendant is to pay a $100 criminal assessment penalty to the Clerk of Court for the Western District of Wisconsin immediately following sentencing.   He is encouraged to honor his agreement to pay this obligation by the day of sentencing.   Failure to pay the assessment may result in preclusion from certain programming while confined in the federal prison system.

Defendant does not have the means to pay a fine under § 5E1.2(c) without impairing his ability to support himself and his minor children upon release from custody when considering the substantial restitution obligation.

# RESTITUTION

Defendant is to pay mandatory restitution in the amount of $4,027,035.51 to the U.S. Clerk of Court for the Western District of Wisconsin to be disbursed to the victim as follows:

> Alliant Credit Union
> 11545 West Touhy Avenue
> Chicago, Illinois 60666

Defendant does not have the economic resources to allow himself to make full payment of restitution in the foreseeable future under any reasonable schedule of payments.   Pursuant to 18 U.S.C. § 3664(f)(3)(B), he is to begin making nominal payments of a minimum of $250 each month, beginning within 30 days of his release.   Defendant shall notify the court and the United States Attorney General of any material change in defendant's economic circumstances that might affect defendant's ability to pay restitution.

No interest is to accrue on the unpaid portion of the restitution.

In addition, the clerk's office is directed to enter a final money judgment in the amount of $4,027,035.51 consistent with the parties' plea agreement and this court's restitution authority.

App. 031

# SCHEDULE OF PAYMENTS

Payments shall be applied in the following order:

(1) assessment;
(2) restitution;
(3) fine principal;
(4) cost of prosecution;
(5) interest;
(6) penalties.

The total fine and other monetary penalties shall be due in full immediately unless otherwise stated elsewhere.

Unless the court has expressly ordered otherwise in the special instructions above, if the judgment imposes a period of imprisonment, payment of monetary penalties shall be due during the period of imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of court, unless otherwise directed by the court, the probation officer, or the United States Attorney.

Defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

In the event of a civil settlement between victim and defendant, defendant must provide evidence of such payments or settlement to the Court, U.S. Probation office, and U.S. Attorney's office so that defendant's account can be credited.

## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

     v.

MICHAEL EISENGA,                                          Case No. 20-cr-137-wmc

     Defendant,

CITY OF COLUMBUS,

     Garnishee Defendant.

## DECLARATION OF SAM MILLER, CPA

Sam Miller declares as follows pursuant to 28 U.S.C. § 1746:

1.      I am a Certified Public Accountant and am employed by KMA Accountants & Advisors.

2.      In my roll at KMA, I provide accounting services to First American Properties, LLC ("FAP"), Columbus Commerce Center, LLC ("CCC"), and other entities in which Michael Eisenga or FAP have an ownership interest.

3.      KMA began providing full accounting services to Eisenga and those entities in 2023.   Therefore, my opinions in the following paragraphs 4-9 are based *solely* upon my understanding of Eisenga's recent deposition testimony and without personal knowledge of the underlying facts or the veracity of Eisenga's testimony.

4.      I understand that Eisenga testified in a recent deposition as to the manner in which he is personally compensated from FAP.  I understand his testimony to be that when he needs funds to cover a personal expense, he or his bookkeeper cause funds to be electronically transferred from FAP's business account to Mr. Eisenga's personal checking account on an "as-needed" basis.

I further understand that Mr. Eisenga testified that he only does this when the FAP entity is profitable.

5.      From an accounting perspective, there is nothing improper about transferring funds in this manner and doing so does not constitute co-mingling of funds.  This type of transfer would properly be categorized as a member draw.

6.      I also understand that Mr. Eisenga testified in his deposition that, at times when the FAP entity is not, on net, profitable, he takes loans from FAP when necessary to cover personal expenses.  Those loans are conveyed in the same manner as the draws described above, but the transfers are notated as loans.

7.      From an accounting perspective, there is nothing improper about this procedure. Indeed, when a member does not draw a salary, this is the recommended procedure for covering personal expenses when a company is not profitable.

8.      I am also aware that Eisenga testified that funds from FAP are often transferred into CCC or other subsidiary entities of which it is the sole member.  From an accounting perspective, there is nothing inherently improper about investing a parent corporation's funds into its subsidiaries.

9.      I am further aware that Eisenga testified that funds from CCC and other subsidiaries are transferred into FAP.  This too is considered a member draw.  From an accounting perspective, there is nothing inherently improper about a parent corporation drawing funds from its subsidiaries.

10.     From my work as an accountant for those entities and Eisenga, I know that Eisenga does not draw a salary from FAP or any of its subsidiaries.

App. 034

11.     Based upon my professional work for FAP, CCC, and Eisenga, I know that both CCC and FAP have historically been treated as pass through entities and their profits and losses were reported on Eisenga's personal income tax returns.  This is proper accounting practice.

12.     To that end, attached hereto as **Exhibit A** is a true and accurate copy of the Schedule C which accompanied Mr. Eisenga's 2021 federal income tax filing, representing the business profit/loss from CCC.

13.     Attached hereto as **Exhibit B** is a true and accurate copy of the Schedule C which accompanied Mr. Eisenga's 2021 federal income tax filing, representing the business profit/loss from FAP.

**I declare under penalty of perjury that the foregoing is true and correct.**

Dated this 21st day of November, 2023.

*Electronically signed by Sam Miller*
Sam Miller, CPA

4866-2523-3809, v. 2

3                                                                        App. 035